# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-1277
Filed June 10, 2026

———————————

**Lawrence Seamans and Seamans Farms, Inc.,**
Plaintiffs–Appellees,

v.

**Adam Kleiss and A.K. Family, LLC,**
Defendants–Appellants.

———————————

Appeal from the Iowa District Court for Chickasaw County,
The Honorable John J. Sullivan, Judge.

———————————

**AFFIRMED**

———————————

Brandt D. Kahler (argued) and Stephanie A. Koltookian of Brown, Winick,
Graves, Gross and Baskerville, P.L.C., Des Moines,
attorneys for appellants.

Jackson Blais (argued), Megan Merritt, and Laura L. Folkerts of
Shuttleworth & Ingersoll, PLC, Cedar Rapids, attorneys for appellees.

———————————

Heard at oral argument
by Tabor, C.J., and Chicchelly and Sandy, JJ.
Opinion by Chicchelly, J.

**CHICCHELLY, Judge.**

This appeal involves a dispute over an easement agreement involving the purchase and disposal of hog manure. After a bench trial, the district court found in the plaintiffs' favor on claims for specific performance and injunctive relief and awarded monetary damages for breach of contract and tortious interference with an easement. On appeal, the defendants challenge the district court's interpretation of the easement agreement, the finding that they breached the easement agreement, the award of $134,757.94 in monetary damages, and the finding that the defendants tortiously interfered with the easement agreement. Finding no error, we affirm.

## BACKGROUND FACTS AND PROCEEDINGS

Lawrence Seamans has farmed for half a century and is part-owner of Seamans Farms, Inc.[1] He owns land in Chickasaw County that he farms for corn and "a few beans."

In November 2010, Seamans sold 2.1 acres of their land to C&N Livestock Farms, L.L.C. (C&N). The purpose of the sale was to allow C&N to build and run a hog farm. The arrangement was mutually beneficial as C&N needed farmers to dispose of the liquid manure produced at the site, and Seamans wanted to use the manure for fertilizer.

Seamans and C&N signed an easement agreement for purchase and disposal of manure effective date July 9, 2011. The relevant parts of the agreement state:

> 1. [C&N] owns and operates a hog feeding facility . . . (hereinafter "Premises")[. Seamans] agrees to purchase liquid animal manure for

---

[1] For ease of reading, we will refer to Seamans and Seamans Farms jointly as Seamans unless it is necessary to distinguish them.

$2500.00 per year, payable on or before September 1st of each year, and remove liquid animal manure, excluding animals and animal parts, from livestock operations conducted on the Premises (hereinafter "Manure") commencing on the date of this Easement and continuing through August 31st, 2026. This Agreement will perpetuate after the August 31st, 2026, date until pork production permanently ceases on Premises. The annual fee will be prorated after 30 days of nonproduction of swine on the Premises.

2. [Seamans] will apply the Manure at or below the legal limits permitted in the Manure Management Agreement . . . after the crops are harvested in the fall . . . .

3. [Seamans] has the right to apply the Manure to other Properties owned or controlled by [Seamans] as long as [Seamans] does so under a Manure Management Plan [(MMP)] approved by the Iowa DNR.

4. [C&N] agrees to pay all costs and fees associated with procuring and maintaining a legal [MMP].

5. [Seamans] shall notify [C&N] or [C&N]'s site manager at least 24 hours prior to beginning the removal of manure. If [Seamans] does not take timely action to remove and apply the Manure to [Seamans]'s Land as field conditions change from year to year, [C&N] is granted an easement upon [Seamans]'s Land to remove the Manure and apply it to [Seamans]'s Land ("Easement"), at rates prescribed by the [MMP]. No Manure may be applied on any portion of [Seamans]'s Land between March 1st and harvest of mature crops unless agreed to by [Seamans].

. . . .

7. This Agreement shall be binding upon and shall inure to the benefit of the parties here to and their respective successors, assign[s], and legal representatives and shall be deemed to be an easement running with [C&N's] premises and [Seamans's] land.

Seamans testified that he would not have sold the land without the easement.

C&N ran the hog confinement facility until 2022. For ten years, C&N sold all the manure produced at the facility to Seamans. C&N also prepared

and submitted MMPs to the Iowa DNR. It submitted an MMP in 2022 that included crop years 2023 through 2026.

In December 2022, C&N negotiated an agreement to sell the hog confinement facility to A.K. Family, L.L.C. (A.K.). Adam Kleiss, A.K.'s owner, signed the purchase agreement, which lists special provisions:

> 4. [C&N] to provide [A.K.] a copy of current site MMP . . . and all current manure easements/application agreements, which are subject to [A.K.]'s approval at [A.K.]'s sole discretion.
>
> 5. Manure easements and/or agreements acceptable to [A.K.] at [A.K.]'s sole discretion, to be assigned to [A.K.]. [C&N] will acquire acceptance by easement grantor if required by easement document. Any manure easements and/or agreements [A.K.] determines to re-negotiate will be developed at the [A.K.]'s expense.
>
> . . . .
>
> 11. Contingent upon [A.K.] having unrestricted manure rights to barns.

Kleiss admits that he received a copy of the easement agreement before signing the purchase agreement with C&N. He also received a title opinion that noted the easement. C&N conveyed the property to A.K. by warranty deed in February 2023.

After A.K. bought the hog confinement facility from C&N, Seamans contacted Kleiss and proposed changing the easement agreement. Seamans suggested that he assume the costs associated with the MMP as set out in Paragraph 4 of the MMP in lieu of paying A.K. $2,500 per year for manure. Kleiss rejected the offer.

In April 2023, A.K. sent the DNR a new MMP that excluded Seamans's fields. Kleiss claimed he did not include the fields because Seamans never provided the soil samples needed. According to Seamans,

A.K. never asked for soil samples and he would have provided them if A.K. had.[2] Seamans received no manure from in 2023, and his $2,500 payment was returned. Because the MMP excluded Seamans's fields, it was illegal for Seamans to remove the manure.

In 2024, A.K. amended the MMP to include Seamans's fields. But A.K. limited Seamans to a single load of manure, which was insufficient to cover the field. Without access to manure, Seamans bought commercial fertilizer in 2024 and 2025 to replace nutrients in his fields.[3]

Seamans filed this action seeking specific performance and monetary damages from A.K. for breach of the easement agreement. Seamans also asked the court to permanently enjoin A.K. and Kleiss from interfering with the easement agreement and declare the easement agreement is a valid and enforceable. Finally, Seamans asked the court to order Kleiss to cease his tortious interference with the easement. The defendants counterclaimed, asking the court to declare that the easement agreement was unenforceable.

After a bench trial, the district court entered judgment for Seamans. It found that A.K. breached the easement agreement and Kleiss intentionally and improperly interfered with it. The court held that Seamans had exclusive right to all manure produced at the hog confinement facility on the adjacent property and enjoined the defendants from removing manure unless Seamans did not do so as set out in paragraph 5 of the easement agreement. The court also declared that the parties are bound by the easement agreement "until pork production permanently ceases" on the premises. It

---

[2] Because soil samples are good for four years, A.K. could have used soil sample reports from 2020 to complete the 2023 MMP.

[3] Seamans again tendered $2,500 for the manure, but A.K. never deposited it.

awarded Seamans $134,757.94 in damages, holding the defendants jointly and severally liable, and taxed costs of the action to the defendants.

## SCOPE OF REVIEW

The parties disagree on the scope of our review, which depends on how the case was tried in district court. *Carroll Airport Comm'n v. Danner*, 927 N.W.2d 635, 642 (Iowa 2019). "If the case is tried at law, our review is for correction of errors at law." *Id.* If the case was tried in equity, our review is de novo. *Id.*

Whether the clerk of court dockets a case as one at law or one in equity does not govern the court's review. *Longfellow v. Sayler*, 737 N.W.2d 148, 152 (Iowa 2007). The question is how the case was tried. *See Horsfield Materials, Inc. v. City of Dyersville*, 834 N.W.2d 444, 452 (Iowa 2013) ("[T]he manner in which the district court actually tried the action determines our standard of review."). We look at the pleadings, requested relief, and nature of the case. *Allamakee County v. Collins Tr.*, 599 N.W.2d 448, 451 (Iowa 1999). If there is uncertainty, whether the lower court ruled on evidentiary objections may serve as a litmus test. *Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 178 (Iowa 2010). *But see Horsfield Materials*, 834 N.W.2d at 452 (applying de novo review despite the trial court ruling on evidentiary objections because "any rulings excluding evidence were minor and did not have a significant effect on the proceedings" (internal quotation marks and citation omitted)). We may also consider whether the parties filed motions normally made in legal actions and whether the district court issued a decree (equitable) or judgment (legal). *Van Sloun*, 778 N.W.2d at 178.

This case was docketed in district court as an action at law. Although Seamans requested both monetary damages and equitable relief, this action

6

is primarily one for damages. The court ruled on the evidentiary objections lodged during trial and entered an order for judgment rather than a decree. We review for correction of errors at law.

## DISCUSSION

The defendants raise several claims on appeal. First, they challenge the court's interpretation of the easement agreement. They also challenge the finding that A.K. breached the agreement by not preparing and maintaining the MMP and by not offering Seamans all manure produced. Next, the defendants contest the award of monetary damages for breach of contract. Finally, the defendants challenge the finding that Kleiss is personally liable for tortiously interfering with the easement agreement.

## I. Did the court err in interpreting the easement provisions?

We begin with the defendants' claims about the court's interpretation of the easement. Because the easement was created by the parties' express agreement, the court must interpret it to give effect to the parties' intention as shown by the language used in the agreement or circumstances surrounding its creation. *McNaughton v. Chartier*, 977 N.W.2d 1, 9 (Iowa 2022). If the easement is granted using specific terms, those terms decide the limits of the easement. *Id.* at 9–10. The defendants challenge the court's interpretation of the easement's duration and the extent of Seamans's right to the manure generated at the site.

### A. Duration

The defendants first challenge the court's interpretation of the easement's duration. The contested provision is in paragraph 1, which describes Seamans's right to remove manure beginning on the date of the easement and continuing through August 31, 2026. The defendants focus on

the next line, which states: "This Agreement will perpetuate after the August 31st 2026 date until pork production permanently ceases on Premises." The defendants argue that the provision violates Iowa law and the Iowa Constitution.

The district court rejected the defendants' argument that finding the easement runs in perpetuity makes the date superfluous. The court rejected that argument, finding that interpreting the easement to end on a specific date makes the provision on perpetuity superfluous. It also noted Seamans's testimony that C&N's mortgage holder insisted on adding the date:

> They required it because that is fifteen years, which is the life of their contract that they had with C&N Livestock, so they required that that date be there and then that agreed to continue on until production permanently ceased.
>
> Q. So the lender wanted to ensure that the hog confinement facility owner had a mandatory avenue for removing the animal manure from the facility? A. Yes.
>
> Q. If a hog confinement facility owner fails to remove liquid manure from its operation, what's the problem? A. The barn would fill up, and they would have to stop production at that site.

The court found this testimony was corroborated by A.K's expert witness, who testified that "today mostly it is the lenders that require the easements because they don't want to be stuck with a barn where they can't spread the manure from." The court thereby concluded that "the Easement Agreement is to continue until pork production permanently ceases on the premises. As pork production has not permanently ceased on the Premises, . . . the Easement Agreement remains in effect."

The defendants argue that interpreting the easement as continuing until pork production permanently ceases on the property is overly

ambiguous because one can never know if production may resume at some future time, even if it is in fifty years.[4] The district court noted that the defendants made this argument in their trial brief, but it found the issue was not before it because pork production continued on the premises. In reviewing the district court's ruling for correction of errors at law, we do not ordinarily address arguments on appeal that were not decided below. *See Braaksma v. Bd. of Dirs. of Sibley-Ocheyedan Cmty. Sch. Dist.*, 981 N.W.2d 134, 140 (Iowa 2022).

Finally, the defendants claim that the provision violates article I, section 24 of the Iowa Constitution, which states: "No lease or grant of agriculture lands, reserving any rent, or service of any kind, shall be valid for a longer period than twenty years." The district court correctly held that article I, section 24 applies to lease agreements, not easements. *See Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 705 (Iowa 2016) (holding that the aim of article I, section 24 is preventing long leases of farming lands for agricultural purposes, which led to oppression of tenants and violent unrest, as well as stagnation and alienation of those parcels of

---

[4] The defendants cite Seamans's testimony:

> Q. All right. And I believe you would agree with me, sir, that there is no way to determine whether pork production on the premises has ever permanently ceased; right? A. I don't agree with that.

> Q. Let me give you an example, sir. Let's say that A.K. Family shut the hog barn down tomorrow. There would be no way of knowing whether that ceasing of pork production is going to be permanent or not; correct? A. Correct.

> Q. Okay. And that's because there is no way to know what's going to happen at some point in the future; right? A. Right.

land). Because the district court did not err in applying the law and substantial evidence supports its finding, we affirm on this issue.

## B. Manure rights

The defendants also challenge the district court's determination that Seamans is entitled to all the manure produced at the defendant's hog confinement facility. The easement agreement says that Seamans will pay $2,500 per year to remove liquid animal manure from the livestock operation conducted on the property. The court found that the easement agreement grants Seamans exclusive rights to all manure produced on the site.

The defendants dispute the district court's interpretation of Seamans's manure rights. They primarily rely on the fact that the easement agreement does not refer to a specific amount of manure or grant Seamans exclusive right to the manure. They also cite paragraph 2 of the agreement, which limits Seamans to application of manure to an amount "at or below the legal limits permitted in the [MMP]," and paragraph 5, which prohibits the application of manure to Seamans's land between March 1 and harvest without Seamans's permission. From these provisions, the defendants extrapolate a limit to the amount of manure applied to Seamans's land amounting to something less than all the manure produced. In other words, if more manure was produced than could be applied under the MMP or if application was necessary before harvest, the easement agreement "clearly contemplates manure being removed and spread elsewhere."

The district court gave three reasons for finding the easement agreement grants Seamans exclusive rights to all manure from the facility. The court also found that Seamans would not agree to pay a set price of $2,500 per year for an undetermined amount of manure that would be decided solely at C&N's discretion. The court also cited the provision

10

granting C&N an easement to remove the manure and apply it to Seamans's land if Seamans did not take prompt action in doing so. Finally, the court found its interpretation was bolstered by the course of dealing between Seamans and C&N, as the undisputed evidence shows Seamans received all the manure each year that C&N ran the facility. *See N. Nat. Gas Co. v. Knop*, 524 N.W.2d 668, 671 (Iowa Ct. App. 1994) ("If ambiguity exists by the terms of the easement agreement, the manner in which the parties themselves have construed them is presumptive evidence of their intention.").

Although the defendants make a case for a different interpretation, the district court did not misapply the law in interpreting Seamans's manure rights. Because substantial evidence supports the court's interpretation, we affirm.

## II. Does sufficient evidence show that the defendants breached the easement agreement?

The defendants next claim that the court erred by finding that A.K. breached the agreement by not preparing and maintaining the MMP in 2023 and 2024 as required by paragraph 4 of the easement agreement. That paragraph requires that the operator of the livestock facility agrees to pay all costs and fees associated with procuring and maintaining a legal MMP. The defendants claim that A.K. could not legally include Seamans's fields in the MMP without Seamans's soil samples. They claim that the easement agreement does not address which party is responsible for providing or obtaining soil samples or grant A.K. permission to enter Seamans's fields to gather soil samples. They add that C&N never gave A.K. the prior MMP or soil samples, and that Seamans did not give A.K. soil samples until October 1, 2024. The defendants also challenge the finding that A.K. breached the easement agreement by not providing Seamans with all the manure from the

11

facility during that period because Seamans's failure to provide soil samples kept A.K. from adding Seamans's land to the MMP and thus prevented Seamans from removing manure.

The district court rejected the defendants' claim that Seamans's failure to provide soil samples excused A.K.'s performance. The evidence of Seamans's and C&N's past dealings shows that C&N obtained soil samples. The court also found that the easement agreement granted permission to collect soil samples from Seamans's land. And the court found it was unnecessary for A.K. to obtain new soil samples in 2023 because the sample taken in 2020 remained good through 2023. Finally, Kleiss never asked Seamans for permission to take soil samples, and Seamans testified that he would not have prohibited him from doing so. The court found Seamans's testimony more credible than Kleiss's and concluded that Kleiss could have obtained soil samples if he had wanted them.

Considering the district court's credibility findings on the issue of which party was responsible for obtaining the soil samples that prevented the manure removal in 2023 and 2024, the evidence supports the finding that A.K. breached the easement agreement. We therefore affirm.

III.   Does sufficient evidence support the award of monetary damages?

The defendants next challenge the monetary damages awarded to Seamans for breach of contract. We have already found that the defendants breached the contract and rejected their claim that cannot show the quantity of manure it is entitled to under the agreement. But the defendants also claim that Seamans did not prove monetary damages because he testified that he buys and adds fertilizer to his fields even when manure has been applied.

The district court awarded Seamans $134,757.94 in monetary damages for breach of the easement agreement. In arriving at this figure, the court reviewed the evidence offered by the parties and found the measure used by Seamans provided the most accurate measure of the nutrients that would be in Seamans's soil if he received manure from A.K. in 2023 and 2024. The court found that the evidence of what Seamans paid for commercial fertilizer to replace the nutrients he would have received from the manure minus the hauling expense Seamans provided a reasonable basis for inferring the approximate amount of Seamans's damages. We find no error.

## IV. Did Kleiss tortiously interfere with the easement agreement?

Finally, the defendants challenge the finding that Kleiss tortiously interfered with the easement agreement. They argue that a party to a contract cannot be found to have tortiously interfered with that contract. Because Kleiss owns A.K., which is a party to the purchase agreement, the defendants argue that he cannot be held liable for tortious interference with the easement agreement.

Seamans claims that the argument the defendants raise on appeal differs from the one raised below. In their trial brief, the defendants argued that "a member of a single-member LLC cannot be found to have tortiously interfered with the LLC's contracts." The district court only addressed this claim in a footnote, finding that Kleiss did not show A.K. is a single-member LLC. Because the district court did not rule on the issue, we cannot consider the argument on appeal.

**AFFIRMED.**